Matthew A. Steward (#7637)
mas@clydesnow.com
Shannon K. Zollinger (#12724)
skz@clydesnow.com
**CLYDE SNOW & SESSIONS**
One Utah Center, 13th Floor
201 South Main Street
Salt Lake City, Utah   84111-2216
Telephone (801) 322-2516

*Attorneys for Plaintiff Brian Craig*

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

---

| | | |
|---|---|---|
| BRIAN CRAIG, an individual, | : | |
| | : | **COMPLAINT** |
| Plaintiff, | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| | : | |
| XLEAR, INC. a Utah corporation; and | : | Case No.: 2:16-cv-00392-DB |
| NATHAN JONES, an individual, | : | |
| | : | Judge: Dee Benson |
| Defendants. | : | |
| | : | |

---

Plaintiff Brian Craig ("Plaintiff" or "Craig"), and individual, by and through his counsel of record, hereby complains, states, and alleges against Defendants Xlear, Inc. ("Xlear" or the "Company") and Nathan Jones ("Jones") (collectively, "Defendants") as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Brian Craig is an individual who resides in Sonoma County, California.

2.      On information and belief, Defendant Xlear, Inc. is a Utah corporation with its principal place of business located at 723 S. Auto Mall Dr., American Fork, Utah 84003.

3.      On information and belief, Defendant Nathan Jones is an individual who resides in Utah County, Utah.

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

5.      Venue in this district is proper under 28 U.S.C. §§ 1391(b)(1) and (2) because Defendants reside in this District, and/or a substantial part of the events and omissions giving rise to the claims asserted herein occurred within this judicial district.

## GENERAL ALLEGATIONS

6.      This lawsuit arises out of intentional acts by Jones, as controlling and majority shareholder, president and chairman of the board of Xlear, to breach the fiduciary duties he owed in that capacity to Craig, by engaging in bad faith and oppressive tactics in violation of Craig's rights as a minority shareholder.   Among other acts, Jones caused Xlear to terminate Craig's employment in frustration of Craig's reasonable expectations of involvement as an officer of Xlear and to thereby realize a return of his investment as a shareholder of Xlear, and caused Xlear to materially breach its contractual obligations to Craig, thereby depriving him of his rightful ownership in the Company.

### Craig's Employment With and Ownership in Xlear

7.      In or around April of 2005, Craig was hired to join the executive team of Xlear, as its Vice President of International Sales.

8.      Xlear is engaged in the business of manufacturing xylitol-based health products. Xylitol is a sugar alcohol sweetener derived from natural sources.

9.      Craig was instrumental in the growth of Xlear's business and revenues during his tenure of employment, from 2005 to 2014.   During the early stages of Craig's employment, Jones was a director, owner, and president of Xlear, but largely withdrew from participation in the day-to-day management and operations of the Company.   Consequently, the management and growth of the Company during the critical period of 2005 to 2013 was handled almost exclusively by Craig and other members of the executive team.

10.     During the course of, and pursuant to, his employment, Craig purchased 6,000 shares of the Company, pursuant to a written "Restricted Stock Holder's Agreement," and attached "Terms and Conditions" dated September 1, 2007 (hereafter, the "Stock Agreement").

11.     Craig exercised his purchase options under the Stock Agreement that were tied to his continued employment over time.   As he increased his ownership in the Company, Craig continued to grow the Company through his active involvement in the marketing of Xlear's products and in developing its relationship with third party brokers.

12.     In May of 2012, Craig was named Xlear's Vice President of Sales and Marketing.

13.     Craig had a reasonable expectation that the value of his ownership in Xlear would continue to grow proportionally with the growth of the Company due to his involvement.

14.     As a direct result of Craig's efforts, Xlear more than quadrupled its sales revenue from 2005 to 2013.

**Jones Begins to Engage in Oppressive Tactics to Exclude Craig from Xlear**

15.     In or around July 2013, Jones decided to start participating in the day to day operations of Xlear, and specifically, marketing.

16.     Jones subsequently began to take away Craig's marketing duties, and on information and belief, had remarked that he was a "much better marketer" than Craig.

17.     Jones created a tense and increasingly difficult work environment for Craig, and frequently employed tactics to exclude Craig from Xlear's business affairs, including, *inter alia*, removing Craig's name from "reply all" e-mail communications, refusing to acknowledge or address Craig in work meetings, and on at least one occasion with Craig present, using racial slurs to refer to Japanese people.   Jones knew that Craig's wife is Japanese.

18.     In or around May and June of 2014, Craig was contacted by employment recruiters.

19.     In July of 2014, Craig received an offer of employment from a company in Santa Rosa, California.   Craig met with Xlear's CEO, Tom Macdonald ("Macdonald") and Jones to discuss the employment offer.   Macdonald told Craig that if he wanted to stay at Xlear, he had a position there, and that Craig was a valuable member of the team, to which Jones appeared to verbally agree.   Macdonald listed reasons why moving to Santa Rosa would incur costs to Craig in taxes and moving expenses, and repeated that Craig had a job at Xlear.   Based on the representations made by Macdonald and Jones, Craig declined the Santa Rosa employment offer.

20.     Nonetheless, shortly thereafter, Jones resumed his oppressive tactics to create a tense and uncomfortable work atmosphere for Craig.

**Jones' Oppressive Tactics Culminate in His Bad Faith Termination of Craig's Employment**

21.     On information and belief, on or about November 21, 2014, Xlear held a board meeting, at which Jones insisted that Craig's employment as an officer at Xlear be terminated.

22.     On information and belief, Jones faced some opposition from the board, including from Xlear's CEO, Macdonald, who stated his belief that Craig was valuable and had a depth of knowledge pertaining to the Company.   In response to Macdonald's statement, another director, Jim Burr, asked Macdonald why he was arguing, "because if [Jones] wants it to be so, that's the way it's gonna be."

23.     On the following Monday before Thanksgiving, November 24, 2014, Macdonald handed out bonus checks to Xlear's employees.   He told Craig that he had "bad news" in that Jones had refused to authorize a bonus check to Craig.   He also told Craig that Jones "wants you gone," such that Craig's employment was being terminated, and that Jones had refused to authorize a severance package for Craig.

24.     When Craig asked why he was being terminated, Macdonald told him that Jones did not want him at Xlear any longer.   In response to further inquiries around the same time, Macdonald told Craig that his termination was due to a personality issue between Craig and Jones, that Utah was an at-will state for employment purposes, and "[Jones] doesn't want you here anymore and therefore, you can go."

25.     At the time, Craig's title was Chief Science Officer and Director of Business Development, and his yearly salary was $150,000.00.

26.     Because Jones had refused to authorize a severance package for Craig, Macdonald told Craig that he would talk to Jones about providing Craig with some funds to get by.

27.     On information and belief, Jones again refused to authorize any type of severance for Craig, and stated that if Craig needed funds to get by, he could sell his shares back to the Company.   Accordingly, Craig offered to sell his shares at a price per share derived from the most recent valuation of the Company in 2012, which offer was refused.

28.     Early in the week following Thanksgiving, Craig met with Macdonald and Blaine Yates ("Yates"), a shareholder and director at Xlear, to discuss a purchase price for Craig's shares. Yates suggested a price and purchase schedule that was agreeable to Craig.   Nonetheless, Craig was told a few days later that Jones had refused to allow the Company to repurchase any shares from Craig, and that if Craig wanted to sell his shares he would have to negotiate directly with

Jones at half the price per share suggested by Yates (and a third of the price per share Craig had

calculated based on a valuation of the Company).    Macdonald told Craig that he knew it was

"very unfair" to Craig.

29.    At no time during the termination process did Jones or any representative on behalf

of Xlear—including Xlear CEO and director Macdonald and director and shareholder Yates, with

whom Craig engaged in multiple communications regarding the fact and circumstances of his

termination—ever make any statement or indication to Craig that he was being terminated for any

reason other than Jones' personal desire to terminate Craig's employment.

30.    Moreover, at no time was any statement or other indication made to Craig that the

reason for his termination had anything to do with "misconduct."    To the contrary, when Craig

asked Macdonald what he should disclose as the reason for his termination in the event he needed

to apply for unemployment benefits, Macdonald told him to state, "at-will situation."

31.    After Craig's employment was terminated, Xlear continued to recognize Craig's

ownership of the 6,000 shares he had purchased pursuant to the Stock Agreement.

32.    Xlear did so by, *inter alia*, purporting to negotiate a sale of Craig's shares back to

the Company, and when those negotiations were halted by Jones, continuing to pay Craig

dividends on those shares for the remainder of 2014 through April 13, 2016.

33.    Indeed, as recently as April 5, 2016, Jones sent Craig a Form 1120S, Schedule K-1

for the tax year ending 2015, which included Craig's 6,000 shares in his percentage of ownership.

34.    Jones nonetheless continued to take actions to oppress Craig's rights as a

shareholder.   When Craig requested a copy of materials that had been distributed as a recent

shareholder meeting, including Xlear's financial statements, the Company responded that it was

no longer sending out financial statements and that if Craig wanted to see them he would have to

come to the offices in Utah in person to see them.   In a subsequent conversation with Yates, Craig

was told that the reason the Company had decided to no longer offer copies of the financial

statements was, in part, to limit Craig's access to Company records.

### Craig is Asked to Sit for a Deposition in a Third Party Lawsuit Involving Defendants

35.     On or about April 21, 2015, a third party broker filed a lawsuit against Wasatch

Sales Force Management, LLC, which, on information and belief, is the entity through which third

party brokers contract with Xlear, and which is wholly owned by Jones and Yates.

36.     Craig is not a party to the pending litigation, and resides outside of Utah.

37.     At Defendants' request, Craig nonetheless agreed to travel to Utah to be deposed as

a witness by counsel for the Company.

38.     At his deposition on or around April 7, 2016, Craig was asked by the Company's

legal counsel to give his opinion about Jones as a businessman.   Craig responded that Jones "can

be very rash in some of the decisions he makes and they can be done at times vindictively."

39.     Craig provided other testimony related to the pending litigation and subsequently

traveled back to his home in Santa Rosa, California.

### Defendants Act in Bad Faith and/or in Retaliation for Craig's Deposition Testimony by Unlawfully Cancelling His Shares Less Than a Week After Taking His Deposition

40.     On or about April 13, 2016—less than a week after Craig's deposition—the same

legal counsel that had deposed Craig mailed him a letter stating:

> You are hereby informed that because your employment at Xlear was terminated
> for misconduct, the Board of Directors has elected to exercise Section 2(a) of the
> Terms and Conditions of Restricted Stock Holder's Agreement executed by you on
> or about September 1, 2007.  A copy of the Agreement is attached for your
> reference.   Accordingly, the 6,000 shares of Xlear stock that you received pursuant
> to the Restricted Stock Holder's Agreement are hereby cancelled effective as of
> November 30, 2014 due to your Misconduct as set forth in that agreement.

41.     Section 2(a) of Terms and Conditions of the Stock Agreement states:

If Employee's termination of Service is due to Misconduct, all Shares shall automatically be cancelled and void.   If then held by Employee, all certificates for such cancelled Shares shall be promptly returned to the Company without payment of any consideration from the Company.   The finding of Misconduct and the fact and date of such termination shall be determined by the Board of Directors.

42.     "Misconduct" is defined in Section 8(c) as:

(i) the unauthorized use or disclosure of the confidential information or trade secrets of the Company, or (ii) the commission of fraud, embezzlement, an act of dishonesty, or any other intentional act that causes harm to the Company (whether convicted of such act or not).   The foregoing shall not be deemed to be an exclusive list of all acts or omissions that the Company may consider as grounds for discharge of the Employee.

43.     Pursuant to Xlear's April 13, 2106 letter, the "fact and date of [Craig's] termination" was determined by the Company to be November 30, 2014.

44.     Craig was not, in fact, terminated for "Misconduct" as defined in the Stock Agreement.

45.     As of November 30, 2014, the Board of Directors had made no "finding of Misconduct" as the reason, in whole or in part, for terminating Craig's employment.

46.     To the contrary, upon Craig's termination, the Company repeatedly told Craig that the only reason for his termination was Jones' personal desire to have him terminated.   At no time did any representative of the Company state or indicate to Craig that he was being terminated for any of the specific acts constituting "Misconduct" in the Stock Agreement.

47.     Indeed, Xlear did not make any demand to Craig to "promptly return[]" his shares under the "Misconduct" provision upon his termination, much less to do so "without payment of any consideration by the Company."

48.     To the contrary, upon Craig's termination, the Company engaged in negotiations to *purchase* Craig's shares.   After Jones refused to allow the Company to purchase Craig's shares

and insisted that Craig would have to sell them to Jones at a third of their value, Craig elected to retain those shares.   He did so for well over a year.

49.     During this period of time Jones and the Company recognized such ownership, up to and including two days before Craig was deposed, when Jones sent Craig the Schedule K-1 reflecting his percentage of ownership.   Moreover, on the same day that Xlear's legal counsel sent Craig the purported cancellation letter, Xlear postmarked its most recent dividend payment to Craig for his shares.

50.     Defendants unlawfully exercised the forfeiture provision in Section 2(a) of the Stock Agreement because (1) the basis for Craig's termination in November of 2014 was not for "Misconduct" as defined in the Stock Agreement; and (2) Defendants exercised the forfeiture provision in bad faith, well over a year after Craig's termination, in continuation of Jones' oppressive tactics to exclude Craig from Xlear and to frustrate Craig's reasonable expectations to realize a return on his investment in the Company as a shareholder and officer.

51.     On information and belief, Defendants committed the foregoing unlawful acts in retaliation for what was deemed to be unfavorable deposition testimony for Jones in the pending litigation, and/or as a bad faith act by Jones against Craig.

52.     As a result of Defendants' unlawful acts, Craig has been deprived of his employment and attendant salary and benefits, his rightful ownership in Xlear, and his reasonable expectations based on such employment and ownership.   Craig has additionally been damaged by the amount of taxes he paid for more than a year on shares that the Company abruptly cancelled retroactive to the date of his termination in November of 2014.

## **FIRST CAUSE OF ACTION**
### **(Breach of Fiduciary Duty Against Jones)**

53.     Craig incorporates by reference all preceding allegations.

54.     At all relevant times herein, Jones, individually as the majority shareholder, president and chairman of the board of Xlear, exercised ultimate control over the business affairs of the Company.

55.     As a majority shareholder, president and chairman of the board of Xlear, Jones owed fiduciary duties of utmost good faith and loyalty to Craig in his individual capacity as a minority shareholder.

56.     As an officer and shareholder in the Company since 2005 and 2007, respectively, Craig held a reasonable expectation that he would continue to realize a return on his investment through his employment with, and ownership and management of, the Company.

57.     Craig's contribution to Xlear extended well beyond mere employment.   Prior to Jones' wrongful acts alleged herein and his termination of Craig's employment in November of 2014, Craig was instrumental in Xlear's explosive growth between 2005 and 2014.

58.     Jones' unlawful acts alleged herein were done intentionally to oppress Craig and to eliminate Craig's rightful ownership in the Company he helped grow to its current state.

59.     Jones' unlawful acts breached his fiduciary duties to Craig.

60.     Specifically, these unlawful acts included, *inter alia*, (1) engaging in increasingly oppressive tactics to exclude Craig, Xlear's Vice President of Sales and Marketing, from the Company's marketing affairs and executive communications and meetings, and to create an offensive and tense work environment for Craig; (2) terminating Craig's employment in bad faith to frustrate Craig's reasonable expectations of involvement in the Company to realize a return on his investment as a shareholder, and refusing to authorize a severance package for Craig or to authorize the Company to repurchase Craig's shares at a fair value; and (3) cancelling Craig's

shares in retaliation for his deposition testimony, and/or in bad faith, because Craig had not, in fact, been terminated for "Misconduct" in November of 2014.

61.    Jones' breach has damaged Craig directly in a manner distinct from any injury to Xlear, specifically through the loss of his individual employment, salary and benefits, loss of his shares under the Stock Agreement, and loss of his reasonable expectation for a return of his investment in the Company through his continued employment with, and ownership and management of, the Company.

62.    As a direct and proximate result of Jones' breach, Craig has been individually damaged in an amount to be proved at trial, including but not limited to actual damages of past and future loss of earnings, rightful ownership of the company and stock and benefits pursuant thereto, and general and punitive damages.

## SECOND CAUSE OF ACTION
### (Breach of Contract Against Xlear)

63.    Craig incorporates by reference all preceding allegations.

64.    The Stock Agreement constitutes a valid and enforceable contract under Utah law.

65.    Craig has fully complied with his obligations under the Stock Agreement.

66.    Xlear, on the other hand, has materially breached the Stock Agreement by, *inter alia*, cancelling Craig's shares pursuant to Section 2(a), because Craig was not terminated in November of 2014 for reasons of "Misconduct," as defined in the Stock Agreement.

67.    As a direct and proximate result of Xlear's material breaches of the Stock Agreement, Craig has been damaged in an amount to be proved at trial.

## THIRD CLAIM FOR RELIEF
### (Breach of the Covenant of Good Faith and Fair Dealing Against Xlear)

68.    Craig incorporates by reference all preceding allegations.

69.     Under Utah law, an implied covenant of good faith and fair dealing inheres in every contract (the "Implied Covenant").

70.     Pursuant to the Implied Covenant, both parties to a contract impliedly promise not to intentionally or purposely do anything to destroy or injure the other party's right to receive the benefits of the contract.

71.     To fulfill that promise, a party must act consistently with the agreed common purpose and the justified expectations of the other party.   Specifically, where one party has discretion over another according to the terms of a contract, that party must act with good faith and fair dealing.

72.     Following the termination of his employment, Craig had justified expectations that he would continue to realize the benefits of his share ownership pursuant to the Stock Agreement, and that Xlear would not do anything to intentionally destroy or injure his ownership in Xlear.

73.     Indeed, for more than a year after his termination, Xlear continued to acknowledge Craig's share ownership by, *inter alia*, paying him dividends on those shares and providing him with tax documents reflecting the number of shares he purchased pursuant to the Stock Agreement, as recently as April of 2016.

74.     Xlear has violated the Implied Covenant by, *inter alia*, inventing, well over a year after the fact and date of Craig's termination and contrary to the Company's acknowledgement of Craig's shares during that period of time, a false and bad faith finding of "Misconduct" for purposes of cancelling Craig's shares retroactive to the date of his termination pursuant to Section 2(a) of the Stock Agreement.

75.     Xlear's acts and omissions were executed intentionally to retaliate against Craig for his deposition testimony, to deprive Craig from receiving the benefits of the Stock Agreement, and to oppress his rights as a minority shareholder.

76.     As a direct and proximate result of Xlear's breaches of the Implied Covenant, Craig has been damaged in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Craig prays that the Court enter an Order granting the following relief:

1.     For a judgment against Defendants for actual, general and punitive damages in an amount to be proved at trial but greater than $75,000;

2.     For specific performance of contractual provisions as provided by law and to the extent elected by Craig as a remedy for Xlear's material breaches, including but not limited to reinstatement of Craig's shares;

3.     For interest on all damages as provided by law;

4.     For attorney fees and costs incurred as provided by law; and

5.     For such other and further relief as this Court deems just and proper under the circumstances.

DATED this May 10, 2016.

**CLYDE SNOW & SESSIONS**

/s/ Matthew A. Steward
Matthew A. Steward
Shannon K. Zollinger

*Attorneys for Brian Craig*